UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

MARC HARRIS,

                                    Plaintiff,

        v.                                              Civil Action Number 3:07–CV–701

JEFFREY W. FRAZIER, et al.,

                                    Defendants.

MEMORANDUM OPINION

        THIS MATTER comes before the Court on Defendants' Motion for Summary

Judgment (Docket No. 68).[1]  For the reasons stated below, Defendants' Motion will

be GRANTED, and Plaintiff's Complaint will be DISMISSED in its entirety.

I.  BACKGROUND

A.  Factual History

        On June 4, 2006, Marc Harris ("Harris") was incarcerated in segregated

housing at Northern Neck Regional Jail ("NNRJ"), awaiting trial.  (2d Am. Compl.

---

[1]  Harris has named the following individuals as Defendants in this case: Jeffrey
Frazier ("Frazier"), Ted Hull ("Hull"), Officer Melody Haynes Morgan ("Haynes"),
Officer William Chatham ("Chatham"), Officer Thomas Russell ("Russell"), Officer
Robert Wagner ("Wagner"), Carolyn Neale ("Neale" or "Nurse Neale"), Sergeant
Fulcher ("Fulcher"), and John and Jane Doe One through Six.  Frazier is the
Superintendent of Northern Neck Regional Jail ("NNRJ").  Hull is the Assistant
Superintendent of NNRJ.  Officers Haynes, Chatham, Russell, Wagner, and Fulcher
are correctional officers at NNRJ.  Neale is currently the head nurse at NNRJ.  John
and Jane Doe One through Six are alleged to be supervisory officials or employees at
NNRJ.

1

¶ 13; Frazier Aff. ¶ 10.)  Harris was told by Sergeant Fulcher ("Fulcher") that he would be permitted one more hour of recreation that day, because the day before he had not had that hour.  (2d Am. Compl. ¶ 14; Harris Aff. ¶ 4.)  Harris became involved in an altercation with Officer Haynes because he wanted to give his lunch tray to another inmate.  (Harris Aff. ¶ 4; Haynes Aff. ¶ 4.)  Officer Haynes told Harris he would have to return to his cell, to which Harris resisted.  (Haynes Aff. ¶ 4.)  Officers Wagner, Chatham, and Russell arrived to assist Haynes in physically escorting Harris back to his cell. (Haynes Aff. ¶¶ 5–6; Harris Aff. ¶¶ 4–5; Chatham Aff. ¶ 5; Russell Aff. ¶ 6; NNRJ 1001–1004.)  During the incident, Harris' wrist hit the wall, made a popping sound, and Harris yelled out that his wrist was broken.  (Harris Aff. ¶ 8; NNRJ 1003, 1004, 1006; NNRJ 111–113; Russell Dep. 49:1–11; Chatham Dep. 50:17–22.)[2]  The officers restrained Harris by placing him in handcuffs behind his back and transported him to a holding cell to be examined by the medical staff.  (Harris Aff. ¶ 9; Haynes Aff. ¶ 7; Chatham Aff. ¶ 5; Russell Aff. ¶¶ 7, 9.)  Harris asserts the officers manipulated his wrist in the handcuffs, while he repeatedly cried out in pain that his wrist was broken.  (Harris Aff. ¶¶ 8, 13, 14.)  Harris also asserts that during the transport from his cell to the bullpen, he asked to have the handcuffs loosened.  (2d Am. Compl. ¶ 20.)  Officer Wagner asserts in his deposition testimony that when Harris asked them to loosen his handcuffs, the officers stopped to loosen his handcuffs.  (Wagner Dep. 43:6–11.)

---

[2]  Harris includes allegations in the Complaint's fact section that relate to the excessive force claim previously dismissed by this Court.  For this reason, these facts are omitted from this memorandum.

2

Once Harris was placed in the holding cell to await medical treatment, the handcuffs were removed.  (Harris Aff. ¶ 18; Russell Aff. ¶ 10.)[3]  Harris asserts the officers knew his wrist was broken because Fulcher and Chatham told Neale, the on-duty nurse, that his wrist was broken. (Harris Aff. ¶ 23.)  Neale's record indicates that someone told her they heard a "pop" when Harris' wrist hit the wall.  (NNRJ 012.) Harris was in the holding cell a total of about forty-five minutes.  (2d Am. Compl. ¶ 23; see Neale Aff. ¶ 7.)  The reason for the delay was because Neale was on-call, but not present in the jail at the time. (Neale Aff. ¶ 7.)  Neale received a phone call from the jail at 1:25 p.m. to report to the jail to provide medical assistance.  (Neale Aff. ¶ 7.) Neale arrived at the jail within twenty-five minutes and saw Harris within fifteen minutes of her arrival at the jail.  (Neale Aff. ¶ 7.)  Neale examined Harris at 2:10 p.m. the day of the incident.  (Neale Aff. ¶ 7; NNRJ 021.)

Upon examination, Neale reported a "small lump on the top of [Harris'] wrist with some swelling.  As a result of these observations and Harris' complaints, his wrist was immobilized with a splint, he was given a sling to immobilize his arm and shoulder, was directed to have ice for twenty-four hours to reduce the inflamation and was provided with Motrin for pain." (Neale Aff. ¶ 10; NNRJ 113.)  Harris asserts he asked for an x-ray, but Neale told him he could not have the x-ray unless he paid the co-pay.  (Harris Aff. ¶ 24.)  Neale alleges that Harris told her he did not want the

---

[3]  Harris bases part of his claim on the fact that all of the officers were trained in first aid, but failed to provide him first aid.  This fact is admitted to by all Defendants. (Wagner Dep. 29:7–31:4; Haynes Dep. 16:4–18:3; Chatham Dep. 31:1–32:23; Russell Dep. 13:13–14:25.)

x-ray because he did not want to pay for it.  (Neale Aff. ¶ 11.)  An x-ray was not done the day of the incident.  (Harris Aff. ¶ 24; Neale Aff. ¶ 11.)

On June 6, 2006, Dr. Reese, the jail physician, reviewed Harris' medical record and initialed an order that the Motrin continue for three days.  (NNRJ 20; Neale Aff. ¶ 13; Reese Aff. ¶ 10.)  On June 8, 2006, Ted Hull, the Assistant Superintendent of NNRJ, approved a request from Nurse Neale for an x-ray of Harris' wrist.  (NNRJ 089; Hull Aff. ¶ 7; see NNRJ 090 (informing Harris that he was on the x-ray list for the next week).)  The x-ray was completed on June 13, 2006, and diagnosed "a non-displaced, slightly comminuted fracture of the distal radius with intraarticular extension.  No additional fracture is seen.  No evidence of dislocation."  (NNRJ 040.)  Dr. Reese reviewed this x-ray report, signed off on the report, and included the notation, "refer to ortho."  (NNRJ 040; Reese Aff. ¶ 11; Reese Dep. 50:15–23.)[4]

On June 27, 2006, Dr. Reese examined Harris again, and Harris asserts that during the exam Dr. Reese said, "[w]hy hasn't this man seen an orthopedic specialist?"  (Harris Aff. ¶ 29.)  Harris also stated that Reese insisted that Harris' wrist needed to be placed in a cast, and he ordered more pain medication and another x-ray.  (Harris Aff. ¶ 29.)  The record of the examination of June 27, includes a notation to "send today to have casted - ortho specialist," but this notation is crossed out and in the same handwriting states "re-x-raying now 3 ½ weeks out / place in

---

[4]  Harris was not housed in NNRJ between June 9, 2006 and June 12, 2006, and again between July 7, 2006 and July 10, 2006.  (NNRJ 116.)

4

wrist [illegible]. Call me with results."  (NNRJ 018.)  The report does not include any order for more pain medication.

Subsequent x-rays were conducted, and on June 28, 2006 Dr. Cockrell (an unrelated third-party physician) reported that "there is a subacute, nondisplaced, nonangulated transverse fracture through the distal radial metaphysis with an associated fracture of the ulnar styloid."  (NNRJ 39; NNRJ 41; Neale Aff. ¶ 14.)  This x-ray report was faxed to the jail on June 28, 2006—the same day of the report—with a cover sheet stating, "Fracture right radius and ulna in good alignment." (NNRJ 041.) Neale received this fax and discussed it with Dr. Reese over the phone, and Dr. Reese advised that an orthopedic follow up was unnecessary. (NNRJ 019; Neale Aff. ¶ 14; Reese Aff. ¶ 11 ("I ordered x-rays and had initially considered an orthopedic follow up.  Based upon the x-rays that were taken and a facsimile to the jail on June 28, 2006, I communicated to the jail, Nurse Neale, that an orthopedic follow-up was not needed.").)[5]

Harris was again examined on July 11, 2006 by Dr. Reese.  (NNRJ 016.)  The Doctor's Notes from that exam state that the plan for Harris' treatment was to "maintain absolute immobilization x 3 weeks + [follow up] with me too."  (NNRJ 016.)  Harris asserts he was never given an "immobilizer" to immobilize his wrist, as ordered by Dr. Reese.  (Harris Aff. ¶ 24.)  He attributes this to an inability on the part

---

[5]  Dr. Reese's affidavit states that the ulnar styloid fracture was, "in his opinion, [ ] an old fracture and was not sustained as a result of the incident of June 4, 2006." (Reese Aff. ¶ 7.)  Harris states that he had never had problems with his wrist before (Harris Aff. ¶ 39), but fails to provide any medical evidence controverting Dr. Reese's assessment.

of the nursing staff, including Neale, to apply the immobilizer.  (Harris Aff. ¶ 24.)  As a result, he was never given anything more than the ace bandages and a splint. (Harris Aff. ¶ 24.)  On July 25, 2006, Dr. Reese examined Harris again, and noted that Harris' wrist was healing from a distal radius/ulnar fracture.  (NNRJ 014.)  The plan was to continue using the splint for one week more, and call the x-ray service to "verify appropriate healing of ulnar styloid."[6]  Harris contends that his wrist continued to be "weak," have a "limited range of motion," and that he submitted "several additional medical requests to have the issue addressed."  (Harris Aff. ¶ 34; NNRJ 072, 073 (Inmate request forms from Harris dated November 20, 2006 and December 4, 2006).)

Nurse Neale alleges that she had no further direct involvement with Harris' medical care, and her only "hands-on treatment of Mr.  Harris was on June 4, 2006." (Neale Aff. ¶ 17.)  Between June 18 and November 12, 2006, it is documented that Harris refused medical treatment eleven times.  (NNRJ 010–013, 015, 017, 019.) Harris asserts he never refused "a medical evaluation, medication, or treatment." (Harris Aff. ¶ 39.)

---

[6]  Defendant's Motion for Summary Judgment asserts that on July 25, 2006, Dr. Reese ordered an x-ray and on July 28, 2006, the x-ray was examined with positive diagnosis.  (See Defs.' Mem. in Supp. Mot. Summ. J. 5.)  Plaintiff's counsel is quick to attack this assertion by pointing out that Harris was never given another x-ray after July 25, and the evidence of the July 28 x-ray report is really that of the June 28, 2006 x-ray report.  The Doctor's Notes from the July 25 exam state that the plan was to "call x-ray service, verify appropriate healing of ulnar styloid."  (NNRJ 014 (emphasis added).)  Nothing is mentioned regarding ordering an additional x-ray, and Dr. Reese never states that he ordered another x-ray in his affidavit or submitted portions of his deposition.

On December 19, 2006, Dr. Reese examined Harris and ordered another x-ray. (NNRJ 009.)  The x-ray report, dated January 2, 2007, noted that, "[t]hree views of the right wrist and right 2, 2007 reveals fracture of the ulnar styloid process which may be old but a prior study is not available to be certain.  The wrist is otherwise negative." (NNRJ 038.)  On January 30, 2007, Dr. Reese saw Harris again because Harris had complained that his wrist was not healing.  (NNRJ 005.)  Reese's notes from that exam state that the wrist was "unremarkable," the "ROM (range of motion) looks good," and that the wrist fracture had healed.  (NNRJ 005; Reese Aff. ¶¶ 6, 12, 13.)  Dr. Reese referred Harris to physical therapy and "ortho."  (NNRJ 005, 044, 045.) An appointment with Dr. Spiegler, an orthopedist, was scheduled for February 28, 2007.  (NNRJ 046.)  But, before Harris could attend the appointment, he was transferred from NNRJ to the Virginia Department of Corrections on February 13, 2007.  (Neale Supp. Aff. ¶ 5; Hull Supp. Aff. ¶ 13; NNRJ 116.)

B.  Legal History

Harris filed suit on November 9, 2007 against four correctional officers, (Chatham, Haynes, Russell, and Wagner), Nurse Neale, Dr. Reese, four anonymous defendants, and the Commonwealth of Virginia as the employer of the individual Defendants.  Harris alleged several violations of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, and state law.  On February 29, 2008, the Commonwealth of Virginia was dismissed from the suit under the Eleventh Amendment.  The Court subsequently dismissed Harris' § 1983 claim of excessive

7

force because he failed to exhaust his administrative remedies, dismissed Dr. Reese as a party for failure to state a claim against him, and dismissed his state law claims because they were barred by the applicable statute of limitations, Virginia Code § 8.01-243.2. The Court permitted Harris to amend his complaint to name the NNRJ Board Authority, Jeffrey Frazier, Superintendent of the NNRJ, and Ted Hull, Assistant Superintendent of the NNRJ, as Defendants. This Court, by Order of October 1, dismissed the NNRJ Board Authority as a party. All remaining Defendants filed the present Motion for Summary Judgment on January 27, 2009.

On February 2, 2009 Plaintiff filed a Motion for Leave to Amend Complaint asking permission to add a previously unknown supervisor as a party, now known as Sergeant Fulcher, and to add a claim of gross negligence of supervision to the existing gross negligence in hiring and retention claim in Count Two. The Court granted the Motion for Leave to Amend, over Defendants' objections, and the Second Amended Complaint was filed February 12, 2009. Defendants were given the opportunity to file a Supplemental Motion for Summary Judgment to account for the amended count and party.

Thus, the claims pending in this case are: Count One, Defendants Chatham, Wagner, Russell, Haynes, Fulcher, Neale, and John and Jane Doe One through Six[7] inflicted cruel and unusual punishment on Harris by demonstrating deliberate indifference by failing to adequately care for his injuries, violating the Eighth and

---

[7] Fulcher was served on March 16, 2009 making his answer due on April 6, 2009, two days before the scheduled trial date. John and Jane Doe Defendants 1–6 remain unnamed and unserved even though discovery has been completed.

Fourteenth Amendments; and Count Two, Defendants Frazier, Hull, Fulcher, Neale, and John and Jane Doe Defendants One through Six breached the duty they owed to Harris to protect his safety and health by negligently hiring, retaining, and supervising correctional officers and medical staff.

Defendants (with the exception of Fulcher and the John/Jane Doe Defendants) have filed a Motion for Summary Judgment based on qualified immunity under § 1983, no evidence of a constitutional violation, and no evidence of supervisory liability under § 1983.


## II.  ANALYSIS

### A.  Summary Judgment Standard

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party.  Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).  While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Celotex, 477 U.S. at 322 (requiring non-moving party to show specific facts by affidavits, depositions, or admissions).  Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

9

Anderson, 477 U.S. at 248.  To overcome a motion for summary judgment, the non-moving party must establish that a genuine issue of material fact actually exists. Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 586 n.11 (1986).  "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law."  Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008).  "Where no genuine issue of material fact exists," it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotation marks omitted).

B.  Count 1: Violation of Eighth and Fourteenth Amendment Constitutional Rights and rights under 42 U.S.C. § 1983 by Cruel and Unusual Punishment

Plaintiff has alleged that Defendants Chatham, Wagner, Russell, Haynes, Fulcher, Neale, and John and Jane Doe Defendants One through Six violated his statutory and constitutional rights by acting with deliberate indifference to his medical needs.  Plaintiff's claims can be broken down into the officers' actions and Neale's actions.  The officers' actions include placing Harris' hands in handcuffs when they knew his wrist was broken, and placing Harris in a holding cell rather than transporting him to hospital emergency room or administering first aid.  Neale's actions including failing to obtain an x-ray of the wrist, failing to place the wrist in a cast, failing to summon a doctor, and failing to administer proper medical care which caused Harris great anxiety and pain because his wrist healed improperly.

Defendants assert that these claims should be dismissed because Defendants are covered under the umbrella of qualified immunity and Plaintiff has not proven the existence of a constitutional violation.

### 1.  Qualified Immunity Standard

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity provides "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  In order to determine if qualified immunity applies, courts consider two factors: (1) "whether the facts that a plaintiff has alleged [under Rule 12(b)(6)] or shown [under Rule 56] make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Pearson v. Callahan, 555 U.S. ___, 129 S. Ct. 808, 815–16 (2009) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Thus, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  Id. at 816 (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  The test from Saucier used to be rigid, requiring courts first to determine whether plaintiff had made out a constitutional violation, and then, if that was satisfied, whether that right was "clearly established."  Saucier, 533 U.S. at 201. However, the Supreme Court recently relaxed the analysis of qualified immunity by

permitting lower courts to consider the two factors in the order most appropriate for the facts of the case. <u>Pearson</u>, 129 S. Ct. at 818 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first <u>in light of the circumstances in the particular case at hand</u>) (emphasis added)).  The Court in <u>Pearson</u> did not change the two factors of <u>Saucier</u>, but held that the analytical sequence was no longer mandatory.  <u>Id</u>.

To be clearly established "means more than it is well-known or easily articulated," it means "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Cloaninger v. McDevitt</u>, 555 F.3d 324, 331 (4th Cir. 2009).  The inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id.</u>  For the plaintiff to survive an argument of qualified immunity at the summary judgment stage, discovery must have uncovered evidence to create a genuine issue of fact whether or not the defendant claiming qualified immunity committed acts which violated clearly established law.  <u>Id.</u> (citing <u>Mitchell</u>, 472 U.S. at 526).  In order for Defendants' argument of qualified immunity to prevail, it must either be demonstrated that there was no constitutional violation, or that the actions taken by Defendants were not in violation of clearly established rights.

In this circumstance, the facts lend themselves to an analysis of the constitutional violation prong first, because this issue is dispositive not only of the qualified immunity issue, but of the entire case.

2.  Constitutional violation: Deliberate Indifference

A claim of inadequate medical care by a person in detention prior to trial arises under the Fourteenth Amendment and is governed by the same "deliberate indifference" standard of the Eighth Amendment governing medical care of convicted prisoners, as was first applied by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104–05 (1976); see City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983) (observing that the Fourteenth Amendment rights of pre-trial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner"); see also Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001) (holding that the "deliberate indifference" standard applies, regardless of whether a plaintiff was a pretrial detainee or a convicted prisoner).  Under this standard, a plaintiff must allege that (1) he was deprived of medical care in a "objectively, sufficiently serious" way and (2) the prison official possessed "a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

The objective component of an inadequate medical care claim is satisfied by a sufficiently serious medical condition or need.  See Estelle, 429 U.S. at 105; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998).  A medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Webb v. Hamidullah, 281 F. App'x 159, 165 (4th Cir. 2008).

The subjective component is satisfied by showing deliberate indifference by prison officials.  See id.  Mere negligence, inadvertent failure to provide adequate

13

medical care, or medical malpractice are not enough to constitute "deliberate indifference." Farmer, 511 U.S. at 835; Estelle, 429 U.S. at 105–06.  Nor does a prisoner's disagreement with medical personnel over the course of his treatment support a cognizable claim.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Instead, "[p]rison officials evince deliberate indifference to a serious medical need by completely failing to consider an inmate's complaints or by acting intentionally to delay or deny the prisoner access to adequate medical care." Hicks v. James, 255 F. App'x 744, 749 (4th Cir. 2007).  As such, "deliberate indifference may be demonstrated by actual intent or reckless disregard." Id.  "True subjective recklessness requires knowledge of both the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  Thus, an official who is aware of a risk to inmate health who responds reasonably to the risk may be free from liability, even if the harm was not "ultimately averted." Farmer, 511 U.S. at 844 ("prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

Furthermore, "deliberate indifference" can occur when there is a delay in the treatment of a serious medical condition only if the delay results in some substantial harm to the patient.  Webb, 281 F. App'x at 165–66; see also Kane v. Hargis, 987 F.2d 1005 (4th Cir. 1993) (affirming a grant of summary judgment in a case in the petitioner was in custody and unable to seek medical attention for four hours despite having suffered cracked teeth, a cut nose, and a bruised face); Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988) (holding that a pretrial detainee's rights were not

14

violated, even though he was not allowed to see a doctor until after fourteen hours of interrogation, despite having a cut over one eye and a piece of glass imbedded in his palm).  The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."  <u>Mata v. Saiz</u>, 427 F.3d 745, 751 (10th Cir. 2005).

### a.  Officers' actions

#### i.  Placing Harris' wrist in handcuffs

Plaintiff asserts that Defendants Haynes, Russell, Chatham, Wagner, and Fulcher "had been informed by Marc Harris that his right wrist was broken, and after hearing the audible sound of Marc Harris [sic] wrist breaking, applied handcuffs to the fracture site tightly causing Marc Harris to cry out in pain when the wrist was obviously swollen."  (2d Am. Compl. ¶ 37.)  This allegation was originally contained in Plaintiff's original Complaint as a factual predicate to the now-dismissed excessive force claim.  The claim was dismissed for failure to exhaust administrative remedies. In Plaintiff's Second Amended Complaint, this factual predicate now appears in the count alleging deliberate indifference.  Notwithstanding the fact that Plaintiff was not given permission by the Court to amend his deliberate indifference claim, Plaintiff also fails to demonstrate that he has exhausted his excessive force claim including the factual predicate that his wrist was forcibly and painfully placed into handcuffs after telling Defendants it was broken.  The claim arising from this factual predicate is one of excessive force, not deliberate indifference.  Because Plaintiff has failed to demonstrate an exhaustion of administrative remedies as it relates to his excessive

15

force claim, and because this claim has already been dismissed, the Court will consider this factual predicate only as part of the "whole" in the overall consideration of Defendant-officers' state of mind with regard to the deliberate indifference claim.

Even considering this factual predicate in relation to the deliberate indifference claim, while possibly negligent, this action was not deliberately indifferent to Harris' medical needs.  It is without question that a broken wrist would meet the first prong for deliberate indifference because a fractured wrist would be understood by a layman to be a serious injury requiring medical attention.  See e.g., Loe v. Armistead, 582 F.2d 1291, 1294 (4th Cir. 1978) ("A broken arm can be an excruciating injury . . .").

Therefore, the question is whether the officers knew of the injury and disregarded the risk to Harris' medical needs.  Harris asserts that he yelled out several times in pain that his wrist was broken and that he was in pain, and this is corroborated by Defendants.  (Harris Aff. ¶ 8; NNRJ 111–113; NNRJ 1003, 1004, 1006; Russell Dep. 49:1–11; Chatham Dep. 50:17–22.)  Furthermore, Nurse Neale's medical record indicates that the officers told her they heard something "pop" during the incident.  (NNRJ 012.)  From this, it appears that the officers knew, or should have inferred, that Harris was at least experiencing a painful injury to his wrist.

Thus, the inquiry is whether the officers disregarded the risk to Harris when they placed his wrist in handcuffs.  The Court finds that this action does not reach the level of deliberate indifference.  Responding reasonably to a risk of harm, even though harm may not be "ultimately averted" cannot establish liability for deliberate

16

indifference.  <u>Farmer</u>, 511 U.S. at 844.  Harris alleges that he asked the officers to loosen his handcuffs because it was painful, but that the officers ignored him.  This allegation is unsupported by any evidence.  In fact, in Defendant Wagner's deposition testimony, he states that when Harris asked to have the handcuffs loosened, the officers stopped to loosen the handcuffs.  (Wagner Dep. 43:6–11 (they "had to stop to do that.").)  Therefore it can be inferred that Defendants acted reasonably, in light of the risk to Harris, when they loosened the handcuffs in an attempt to avert harm, even though ultimately some harm may have come to Harris.

There is, however, the issue of placing Harris in the handcuffs in the first place.  In <u>Reese v. Herbert</u>, the court held that the officers did not disregard the plaintiff's need for medical care even though they knew he screamed, "you broke my arm," but they, nevertheless, put him in handcuffs to transport him to the jail.  No. 4:06CV-0193, 2006 WL 1892026, at *16 (N.D. Ga. July 10, 2006).  Because the officers quickly transported the plaintiff to the jail and called a medic to treat his injury within minutes of arriving at the jail, the court found the officers acted reasonably and did not act deliberately indifferent to the plaintiff's needs.  <u>Id.</u>; see <u>Walck v. Dunkerson</u>, No. CV04-55-H-DWM, 2007 WL 4179411, at *11–12 (D. Mont. Nov. 16, 2007) (holding that officer's attempt to loosen the handcuffs and the fact that the handcuffs were not applied to punish—just restrain—the inmate did not reach the level of deliberate indifference).  A California court held that the plaintiff failed to demonstrate deliberate indifference by the officers when they placed handcuffs and ankle restraints on a plaintiff with noticeable burn wounds and scars on his body,

17

when the plaintiff remained silent during the incident.  <u>Windham v. Cal. Dep't of Corrs.</u>, No. Civ S05–0954GEBGGHP, 2009 WL 57622, at *10 (E.D. Cal. Jan 9, 2009). The critical element in that case was that the plaintiff had remained silent while having the restraints placed on his body even though he was in extreme pain.  <u>Id.</u> While the court found that the officers knew or should have known placing handcuffs on the inmate would be painful because of his visible condition, the plaintiff's silence persuaded the court that the officers did not intend to disregard the risk to his medical needs.  <u>Id.</u>

Following the reasoning behind these decisions, the Court finds that the actions in this case were not deliberately indifferent.  Harris made it well-known he was in pain, which should have put the officers on notice that he needed medical attention, if they were not already aware.  However, the reason Harris was placed in handcuffs was because he "was a known escape risk and . . . the corrections officers had no discretion as to whether or not to secure Harris with handcuffs when escorting him from E Pod to medical."  (Frazier Aff. ¶ 10.)  Additionally, the officers immediately transported Harris to medical for treatment and even stopped to loosen his handcuffs along the way.  Moreover, Harris' handcuffs were removed after ten minutes in his holding cell.  (Harris Aff. ¶ 18.)  Taking these facts together, and even considering them in the light most favorable to Plaintiff, it appears that the officers were acting reasonably and did not disregard any risk to Harris' medical needs when they placed him in handcuffs during transport

<u>ii.  Placing Harris in the holding cell without administering first aid</u>

18

Harris asserts that all of the officers were trained in first aid, yet none of them administered first aid to his wrist, thereby depriving him of access to medical care. It has already been discussed that Harris had a serious injury of which the officers were aware, or of which they should have been aware. But deliberate indifference only arises when a party "knows of and disregards an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837. To bring a claim of denial of medical care against these Defendants, the Fourth Circuit requires a showing that the prison officials were personally involved with denying treatment. <u>Miltier v. Beorn</u>, 896 F.2d 848, 855 (4th Cir. 1990). Further, "[p]rison personnel may rely on the opinion of the medical staff as to the proper course of treatment." <u>Lewis v. Roanoke County/Salem Jail</u>, No. 7:08-cv-00400, 2008 WL 2776202, at *4 (W.D. Va. July 16, 2008) (citing <u>Miltier</u>, 896 F.2d at 895).

While it is true that the officers were trained in first aid, and Harris did have to wait for forty-five minutes until Neale arrived to administer medical care, nothing from the facts gives the impression that the officers were deliberately indifferent by disregarding Harris' needs. It is entirely reasonable that the officers would have waited for Neale to arrive to administer treatment, because she was on-call and had responded immediately to the call for assistance. The time Harris waited for Neale to arrive and administer medical care (forty-five minutes) was minimal compared to other time periods found to be deliberately indifferent. <u>See</u> <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 201 (9th Cir. 1989) (three month delay in obtaining replacement dentures); <u>Fields v. Gander</u>, 734 F.2d 1313, 1314–15 (8th Cir. 1984) (three-week delay in

administering dental care); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978) (eleven hour delay in administering medical care to a broken arm was enough to state a claim for deliberate indifference).  <u>But see</u> <u>Martin</u>, 849 F.2d at 871 (holding that a fourteen-hour delay in obtaining medical care after suspicion of a broken limb, a cut over one eye, a piece of glass embedded in a hand, and bruises to the shoulders and elbow, was not found to be deliberately indifferent because the injuries were not that severe).  Additionally, no substantial harm can be demonstrated by the forty-five minute wait Harris endured, because all of the medical evidence submitted demonstrates that Harris' wrist healed properly.  (<u>See</u> NNRJ 005; Reese Aff. ¶¶ 6, 12, 13.).  Harris has provided no "competent medical evidence" supporting a theory that Defendants' actions had a detrimental effect on his wrist.

For these reasons, it appears that the officers were not deliberately indifferent to Harris' medical needs.  Therefore, Harris has failed to prove the officers violated his  constitutional right to be free from cruel and unusual punishment.

b.  Neale's actions

Harris asserts that Nurse Neale's actions (only providing him a splint and a sling, not providing him a cast, refusing to x-ray the wrist, not following Dr. Reese's orders regarding an referral to an orthopedist) were deliberately indifferent to his medical needs.  While Harris may have an argument for negligence, but has failed to meet the standard of deliberate indifference.

In <u>Bazemore v. Emran</u>, the court found no deliberate indifference even though the doctor initially diagnosed the plaintiff with a sprained wrist, provided him with

20

an ace bandage and an x-ray, when in fact the plaintiff presented with a fractured wrist.  No. 03-704AM, 2003 WL 24037953, at *1–2 (E.D. Va. Nov. 18, 2003) (noting also that the delay of six days between visits did not demonstrate deliberate indifference).  In O'Bryan v. Federal Bureau of Prisons, the court found no deliberate indifference when inmate broke his wrist but was initially given an ace bandage, diagnosed with tendinitis, and given a prescription for over-the-counter pain medication.  No. 6:07-76-DCR, 2007 WL 2571906, at *8–10 (E.D. Ky. Sept. 4, 2007).  It was discovered later, however, by an x-ray, that the inmate had a fractured wrist, but was still treated with a bandage and a follow-up x-ray.  Id.

Harris contends that Neale was deliberately indifferent to his needs by only providing him a splint for his fractured wrist.  However, given the case authority, splinting a broken wrist is a medical decision, and a disagreement over medical care is not enough to allege deliberate indifference.  Wright, 766 F.2d at 849.  Additionally, reviewing Neale's other initial treatment in the light most favorable to Plaintiff, the facts do not amount to the level of deliberate indifference.  Harris was seen by Neale within forty-five minutes to an hour of the injury, a splint was placed on the wrist, his arm was put in a sling, he was prescribed pain medication, an x-ray was requested and approved four days later, and the x-ray took place nine days after the incident.

As to the issue of Neale denying Harris the x-ray because he would not pay for it, it appears to be inconsequential whether she denied him the x-ray because he would not pay or whether he refused the x-ray because he did not want to pay; the decision to order an x-ray is a matter for medical judgment.  Estelle, 429 U.S. at 107

21

("A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."); <u>Sylvia v. Maddox</u>, No. 5:05CV13, 2007 WL 2300799, at *5 (W.D.N.C. Aug. 7, 2007) (finding no deliberate indifference even though an x-ray of the inmate's nose at the first examination would have been a better decision, the nurse only noticed an abrasion not warranting an x-ray, although it was discovered a few days later that the inmate's nose was indeed broken).

Harris alleges that the jail policy was to provide an x-ray if a fracture is suspected, and Neale violated this policy by refusing care of an inmate because of a failure to pay.  (Neale Dep. Ex. 8 (NNRJ Medical Co-Payment Standards); Neale Dep. Ex. 9 (NNRJ Nursing Care Protocols: Fractures)).  However, the evidence demonstrates that the Nursing Care Protocols for fractures states that, "3. Suspected fractures require evaluation by the physician and <u>probably</u> x-rays."  Harris' x-ray was approved on June 8, four days after the incident, and Neale's report of Harris' injury was reviewed by Dr. Reese two days after the incident.  Furthermore, whether or not Neale violated the co-pay policy of the jail is unimportant because she received authorization for an x-ray for Harris on the 8th, and the x-ray was taken on the 13th.[8]

Harris further contends that Neale violated his right to be free from cruel and unusual punishment because, as he states, Dr. Reese was "frustrated" during his examination that Harris had not yet seen an orthopedic specialist, or had his wrist placed in a cast.  It is true that Dr. Reese's approval of the June 13 x-ray report includes a note "refer to ortho," (<u>see</u> NNRJ 040), however, upon review of the June 27

---

[8]  Additionally, Harris was not housed at NNRJ between June 9 and June 12, 2006.

22

x-ray report, Dr. Reese stated that orthopedic follow up was unnecessary.  (NNRJ 019; Reese Aff. ¶ 11.)  Harris provides no evidence that a failure to refer Harris to an orthopedist during those two weeks caused him permanent harm, and the fact that Dr. Reese rescinded his order for the orthopedic referral, indicates that Neale's actions do not amount to deliberate indifference.

Additionally, Harris claims his wrist was ordered to be placed in an immobilizer, but the nursing staff failed to apply it to his wrist, causing him pain.  It is true that on the July 11 exam by Dr. Reese, he ordered that the staff "maintain absolute immobilization,"(NNRJ 016) but there is no mention of a device other than the splint currently in use to achieve this goal.  There is no record of an order to provide any specific device called an immobilizer, nor does Dr. Reese refer to such an item to completely "immobilize" Harris' wrist.  Even viewing this fact in a light most favorable to Plaintiff, the evidence does not suggest that the failure to apply an "immobilizer" negatively impacted Harris' recovery, or that Neale acted with disregard to Harris' needs.

Lastly, Plaintiff states that his wrist continued to be weak and in pain, causing him to submit further requests for medical attention.  (Harris Aff. ¶ 34; NNRJ 072, 073.)  He contends that these requests prompted Dr. Reese to make a referral to an orthopedist and physical therapist on January 30, 2007, but that Neale failed to follow through with these orders.  It is true Reese examined Harris on the 30th, and the evidence shows that the nursing staff set up an appointment for Harris to be examined by an orthopedist on February 28, 2007.  (NNRJ 046.)  Harris apparently

23

never made it to the appointment—which he asserts was Neale's fault—because Harris was transferred from the custody of NNRJ on February 13, 2007, fifteen days before he was to be seen by the orthopedist.  It is clear Neale did not disregard Reese's orders, and did not disregard Harris' medical needs because an appointment was scheduled, which he failed to attend for reasons other than deliberate indifference by Neale or the medical staff.

The evidence shows that the officers acted reasonably when they transported Harris to the holding in handcuffs, and acted responsibly by calling the nurse who arrived forty-five minutes after the incident.  Additionally, Neale's actions were clearly not deliberately indifferent to Harris' needs because she acted reasonably in response to Harris' injury, and closely followed the orders given by Dr. Reese.  Lastly, there is no evidence that any denial or delay in treatment caused or exacerbated Harris' injury, because he has submitted no medical evidence supporting his assertion that the officers or Neale caused him permanent injury.  For these reasons, the Court finds that there was no deliberate indifference to Harris' medical needs and therefore, no constitutional violation of the Eighth or Fourteenth Amendments.

### 3.  No constitutional violation, therefore qualified immunity applies

Because Harris has failed to prove that a constitutional violation occurred, qualified immunity should apply to the officers and Neale.  However, failing to prove a constitutional violation also entirely disposes of Count One of the Complaint because Harris cannot sustain a claim that his constitutional rights were violated.  Therefore, Defendants' Motion for Summary Judgment as to Count One will be

GRANTED.  The Court notes that by finding that no constitutional violation occurred,

Plaintiff cannot state any further claims against Fulcher and John and Jane Doe One

through Six.  There are no additional facts alleged against these parties which would

make out a viable constitutional claim.  For this reason, Count One is DISMISSED in

its entirety.


C.  Count 2: Violation of Civil Rights Due to Gross Negligence in Supervision,
Training, Hiring, and Retention

      Plaintiff next asserts that Frazier, Hull, Sergeant Fulcher, and Nurse Neale

owed a duty of care to Plaintiff to ensure his safety, they breached that duty, and

caused Plaintiff harm in the form of a violation of his constitutional rights.  Frazier

and Hull are being held responsible as the Superintendent and Assistant

Superintendent of NNRJ, respectively.  Plaintiff asserts that Nurse Neale was the

"head nurse" at NNRJ on June 4, 2006, and Sergeant Fulcher was the supervisor of

Defendants Haynes, Chatham, Wagner, and Russell at the time of the incident.

Defendants move for summary judgment on Count Two because there was no

constitutional violation to support any claim of supervisory liability under 42 U.S.C. §

1983.

      In order to assert liability for the actions of a subordinate onto a supervisor, the

subordinate employees/officers must have committed a constitutional violation.

Huggins v. Weider, 105 F. App'x 503, 506 (4th Cir. 2004); Young v. City of Mt. Rainer,

238 F.3d 567, 579 (4th Cir. 2001).  Because supervisory liability under § 1983 cannot

exist without an underlying constitutional violation, and no constitutional violation

was committed by the officers or Neale, summary judgment is proper for Defendants Frazier, Hull, Neale, and Fulcher on Count Two.  For this reason, Defendants' Motion for Summary Judgment as to Count Two will also be GRANTED and DISMISSED in its entirety, including the claims against Fulcher and John and Jane Doe One through Six, for the same reasons stated above.

### III.  CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment as to Counts One and Two will be GRANTED, thereby DISMISSING Plaintiff's Complaint in its entirety.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate ORDER shall issue.

_____/s/_____
James R. Spencer

ENTERED this __30th__ day of March 2009

26